Good afternoon, Your Honor. May it please the Court, Van Bunch for the plaintiff's appellants in this matter. As the Court is aware, the case involves consumer fraud claims from about 13 different state jurisdictions, including California, that arise out of a hidden corrosion defect in a first-generation Yamaha high-horsepower outboard motor. The District Court below committed reversible error in construing the complaint factually in two different areas and also impermissibly and erroneously dismissed Yamaha Motor Corp., a Japanese parent, from the case. Let's start with the jurisdictional issue, if you don't mind. Why, in light of Daimler, how can you contend with the District Court? Let's start with general jurisdiction. I'll call it YMC, the parent corporation. We call it Mamaha. Whatever you want to call it. But I'll call it YMC. Okay. You can call it Mamaha, whatever you want. Sounds like a cool name anyway. Go ahead. Why do we have jurisdiction in light of Daimler? Well, Daimler came down shortly after the jurisdictional arguments in the case. In general jurisdiction terms, Daimler, of course, had nothing to do with California factually. There was no plaintiff. Oh, the United States. California is in the United States. There are some that disagree with that, but I wouldn't say for now. As you know, in the Daimler case, the plaintiff was foreign. They tried to tag the foreign parent through general jurisdiction over a subsidiary here. That's what's happening here, isn't it? No. In what way was YMC at home in California? Let's start with that. Well, let's call it a second home. Okay. Why don't you describe the home? Tell us about the home. Yamaha Motor Corporation, YMC, set up Yamaha Motors USA. Okay. I have nothing wrong with that. Correct. It's a subsidiary. And operates its marine division through the facility at Cypress, California. Are you saying that the subsidiary does this or the parent does this? The parent is divided into four basically global divisions, one of which is the marine division. Is it a division or a subsidiary? They operate the divisions of the business enterprise through subsidiary corporations. Okay. Is it an alter ego of the parent? There are no alter ego allegations in the complaint because we did not have an opportunity to make it. Okay. So then it's at home in the sense of Daimler in what way? It's at home in the sense of Daimler in the sense that for it to operate at all in the United States and enjoy the fruits of its 42% of the marine sales in North America, it directs the subsidiaries, marketing, advertising, approves the sales incentives. So you're saying it's purposely directed to California. Is that right? That is also true. Okay. So did you produce any evidence that shows or I guess you were at a pleading stage. So what did you indicate to show that that was the case? The purposeful availment? The purposeful availment, of course, under Daimler and other cases since Daimler, they left open the proposition that specific jurisdiction could lie. So the purposeful availment comes from the allegation of specific personal jurisdiction. Let me ask you. Let's go a little farther on this. Does the UNICAL agency test survive Daimler? I don't see why not. Why would it? Why would it not? You have to answer the question. You could be here all day. Let me explain. I'm the judge, you're the lawyer. I got you. The agency test itself is what survives. If it's an agent, it's an agent, it's an agent. An agent is an agent is an agent. And here. It's a tautology to me. No, the facts of the case are such that it's not even arguable, really, that Yamaha USA is the agent of Yamaha Motor Corporation for the purpose of selling outboard motors in California and across the United States. That argument would hold true for any independent distributor? For the purposes of specific, not any independent distributor. What about general jurisdiction? Is there any general jurisdiction? The general jurisdiction question was made very difficult in this case by the Daimler. So there is none. So let's talk about specific jurisdiction. Please. Where did the tort take place? When? Where? The tort took place at the time of purchase in the various states in the United States. Well, you're talking about a fraud, a failure to disclose. Yes. It was consummated at the time of purchase. But the question is where was the tort committed? The tort, the omission to disclose the hidden corrosion defect, was jointly the responsibility of Yamaha Motor Corporation in Japan and Yamaha Motors USA. So it was Yamaha Motor Company in Japan. There's no long-arm jurisdiction because the tort was committed in Japan. You're not suing on a latent defect theory which would travel with the goods. It's a personal theory. It's personal to the fraud doer, the person who committed fraud. The person who committed fraud, you allege, is Yamaha Motor Company, YMC. Where? Where was the tort? The tort occurred when YMC and Yamaha Motor USA sold the product without disclosing the hidden defect. So there had to be a tag along with it or a label or something, and the tort was measured by the absence of information on the label. Is that your theory? The label, you mean the motor has Yamaha Motor Corporation's stamp on it? If that or something else. Somewhere there has to be a communication. A fraud is a deception in a communication. This message from me to you, that's the fraud, right? So where is Yamaha Motor Company when it committed the fraud? It was acting through Yamaha Motor USA. So your case is all on agency then. At least certainly in the specific case. For the jurisdictional aspect, correct. That's the whole case. You agree there's nothing else in terms other than agency. So you're relying on UNICAL. You think UNICAL survives stainless. If it doesn't, do you lose? I think the agency theory survives. Okay, I understand that. My question, listen carefully, my question is, if the agency theory doesn't survive Daimler, you lose, right? In terms of jurisdiction. On the record in this case, without taking jurisdictional discovery, the affidavit of the Yamaha Motor Corporation employee assiduously maintains that Yamaha Motor Corporation has never visited the United States for jurisdictional purposes. And we were not allowed to take any jurisdictional discovery to test. But I think his question was one of these or these, thumbs up or thumbs down. So answering his question, is it a thumbs up or thumbs down if the theory doesn't survive Daimler? Thumbs down, right? I'm going to give you a thumbs down on that one. Okay. So we at least know your position on this. There's no general jurisdiction, as you conceded to my colleague. There's no special jurisdiction if Daimler overruled UNICAL in so far as agency is concerned, right? That's correct. Okay. So at least we know your position on jurisdiction. Thank you. Now, moving over to the substantive allegations of the case with respect to the hidden defect, the court, as has been observed here today, not only required a brief, she got a brief, and she didn't like the evidentiary basis for it. She misapplied the Twombly-Iqbal standards, first by believing to the exclusion of the plaintiff's allegations, the defendant's construction of the facts. As this court said was improper in the Ebner v. Fresh, Inc. case, she applied a probability test and not a plausibility test. And the second thing she did was on a case that has been effectively overruled by the PAE Government Services decision of this court, she refused to accept well-plaid and, in fact, well-researched and investigated allegations in the Second Amendment complaint about certain aspects of pre-sale knowledge that we argued pertained to the case. For example, we said that as early as 2002, Yamaha Motors USA was developing a repair kit for this hidden corrosion problem in this outboard motor. Let's assume for a moment that I agree with you about the pre-sale. We're only dealing with Yamaha USA, right? I know that's not the complete name of it. The parents are out of it if there's no jurisdiction, right? That's what we have decided, yes. Excellent. Okay. So but your cases against the subsidiary, if there was a they had this pre-sale knowledge and so on, and they said that's an evidence that they knew perfectly well what was going on. Correct. They knew perfectly well what was going on because if you believe what Yamaha Motor Corporation's position is, Yamaha Japan's position is, they don't know what's going on in America unless the subsidiary tells them. So what happened was they rolled this first generation, and by first generation we mean it's basically a groundbreaking new product. It has an internal four-stroke motor instead of the old two-stroke motors for a 200-and-up horsepower motor. And as soon as they rolled it out to the market, within a year or two, they began to get complaints from charter boats and heavy users that, hey, something's going on with this engine. Yamaha USA went to Yamaha and advised Yamaha Motor Corporation of this fact. We know that's true because Yamaha Motor Corporation sent personnel to Fort Pierce, Florida, and later to Bridgeport, Alabama, its own people, for the purpose of testing this repair kit. And the only way they would know to do that, the only way they would be compelled to do that, is if they knew something was going on with this motor, and they specifically knew it was corrosion because Yamaha USA set up in Kennesaw, Georgia, a line of defense. They set up a customer service center there that was designed at 24 employees, and it was designed to field questions about this corrosion problem. By the way, how did you know all of this? Where did that information come from? We hired a private investigator who talked to former employees, one in Fort Pierce and Bridgeport and one in Cypress. Do you want to save any of your time for rebuttal? I do. Okay. Thank you. Oh, I'm sorry. Do you want to ask a question? Where do you allege the requirements of 9B? If you're proving, if you're alleging fraud and deception, you need to allege the particulars of time and place. Where in the complaint is that? I couldn't find it. In an omissions case, it's the materiality component of the inquiry takes precedence. But you have to know that there's an omission. You have to be purposefully deceptive about it. Where have you alleged that? Correct. They told early complainers that it was their own fault. Where have you alleged it? It's in the complaint. While you're sitting there, maybe you can find the paragraph. I shall. Okay. All right. We'll hear from the appellee. May it please the Court. The N.A. Evangelist on behalf of Yamaha. This case is about decade-old outboard motors that indisputably performed throughout their three to five year warranties and for many years after, in some cases more than a decade. Plaintiffs brought this case because they want Yamaha to pay for repairs that they allege that they had to make after wear and tear caused issues with their motors. And as this Court held in Wilson v. HP, the plaintiffs can't use consumer protection laws to get around the limited warranty here. And Wilson v. HP controls exactly in this case. And there, this Court held that the duty to disclose applies only to defects that are known pre-sale to cause an unreasonable safety risk. Okay. So we talked about jurisdiction. I assume you don't disagree with what we talked about jurisdiction, right? No, Your Honor. Actually, this Court in Ranza v. Nike held that after Daimler, the agency theory is dead. So plaintiff's counsel is correct about that. Okay. So now we get to the pre-sale. You know what they've alleged in terms of the kits and all sorts of things. At least with respect to the subsidiary, it certainly seems like the Yamaha USA was aware that there was a problem and at least allegedly started to do something about it, but it mainly blamed the customers. Now, that's their allegation. I'm not saying it's true. Isn't that sufficient to satisfy the pre-sale aspect of this, pre-sale knowledge? No, Your Honor, and I'll explain why. They haven't alleged the facts to support that. What they have alleged is that here that the corrosion set in five to seven years after normal use. So their whole theory was based on the fact that they didn't know that there was corrosion. That's why they didn't bring their claim sooner. That's why they were outside the warranty period. So they have alleged that repeatedly throughout this case. Then they have alleged certain things that they claim show knowledge. They claim there's a safety consequence of what happens with the corrosion. They have alleged the corrosion in the five to seven year period after the expiration of the explicit warranty and they allege that there is a safety consequence to that. They haven't alleged that Yamaha. They argue that there was knowledge because of all the servicing activities that occurred in the southeast. Well, Your Honor, those allegations don't show knowledge of a safety hazard, which is what this court held in Wilson and that was at page 1146. The court said that there HP did not have pre-sale knowledge of a safety issue. And here there's no evidence of that. What they've cited is a replacement kit. But replacement kits in the first place aren't evidence of knowledge of a defect. Manufacturers often provide replacement parts and kits, make them available for their products. And here they're alleging that the products lasted, the motors lasted way beyond the warranty period. Is it your position that if a, again, arguendo, if Yamaha designed a motor that had inherent problems, it was only a question of when it was going to be defective. Is it your position that as long as the defect is not discovered during the warranty period, that's it? Well, Your Honor, this court held in Wilson v. HP and also in Clemens that products are not guaranteed to last forever and that every manufacturer who makes a product can be said to know that at some point the product will fail. But that's a very different case. I golfed with the lawyer who litigated that for HP, and it's a very different case. In this situation, you're talking about something where you're talking about an exhaust system that presumably there could be a fire or something like that. It's quite different from the level of ink in an HP container. So let's not mix those up. Here, do you agree that the allegation that the design was such that all this exhaust was coming around inside the engine, causing corrosion, and that the very fact that it was designed that way could lead to a fire or an explosion or something like that? Your Honor, plaintiffs have alleged that, but the motors have been on the market for 17 years, and they haven't pointed to a single instance of flames. They claimed a few instances of smoke. Yes, it is, Your Honor, here, because smoke is not fire. They claim that there's a risk of fire, but that's – and in Wilson, Your Honor, there were allegations of flames coming out of the computer because of the power source there. So it actually is quite similar. And here, plaintiffs had this theory all along about corrosion, but they've admitted that corrosion is a fact of life. It's not a defect. These are boat motors in the water, and they acknowledge that. You may be right, but we're talking about allegations. Just, for example, paragraph 245 of the Second Amendment complaint said that if you lose power, you lose steering. If you lose steering, you lose control. If you lose control, you're at the mercy of all kinds of issues that affect safety. Your Honor, they haven't – Allegation. They do. That's entirely speculative. It's like the allegations that this court rejected in Birdsong v. Apple. But more importantly, they've never alleged any instance of that. But if that were the case, then any time a motor fails because of – They allege various Coast Guard studies that deal with accidents and the proclivity of accidents when you lack power. Your Honor, then that would mean that every boat motor must last forever because we know that's not the law. But if that were the case, then any time a motor fails because a certain component part has worn out because of wear and tear, it would be actionable. And in Doherty v. – It goes to reason. What you're saying means that you'll win the case eventually, but it doesn't mean that we should bar the courthouse door to people who want to complain. Actually, it does, Your Honor, under Iqbal and under eclectic properties, this court's decision there. Plausibility. It is not plausible. By saying that you're losing control, having safety features, and it happens too early in a life of an engine, which has a certain useful life and people buy it in that expectation, it seems to me that we are again confusing the issue of who will win the case eventually with what's necessary to get in the courthouse door. Well, Your Honor, first of all, plaintiffs have admitted that Yamaha discloses the risks that are associated with loss of engine power. So that's a separate issue. But here the court does have to evaluate the plausibility of these allegations and that it's not a reasonable inference. But I'll move on from the safety issue. And I really don't believe that plaintiffs have alleged enough here because it would be the case that every motor could never fail. And in Doherty v. American Honda, there were automobile engines there, and there was an oil seal that failed and caused leaks after the warranty period, and it led to the entire loss of an engine, engine failure completely. And there that wasn't enough to state a claim, and that's very similar to this case. But going back to presale knowledge, there's no evidence that Yamaha had presale knowledge of this safety issue. Plaintiffs have alleged the replacement kit, which is not enough simply to say that there are replacement parts of it made available. Plaintiffs claim that Yamaha marketed that. That's the opposite of concealment. So that doesn't work. They also claimed originally several times that it came out in 2006. No plaintiff in this case alleges seeing it until 2013. All of that matters under this court's decision in Wilson v. HP. Plaintiffs came back in their latest pleading after Judge O'Connell considered all of this and said none of it shows presale knowledge. They came back and said that this replacement kit was actually issued around 2002, inexplicably changed the date to conveniently come four years before the date they had been alleging several times. Is there any allegation of presale knowledge? There isn't here because the only allegations are this replacement kit, which I submit, Your Honor, doesn't get them there. There are allegations of consumer complaints, but the only specific complaint that's alleged here is from 2005, and that was on a website. And as this court held in Wilson v. HP, consumer complaints don't show knowledge. They show that people were complaining. And none of the allegations talk about complaints of safety issues, not at all. And so complaints... Is there an explicit allegation that says that defendants or any of them had presale knowledge? Plaintiffs allege that specifically in those terms? No, Your Honor. They're conclusory. And as Your Honor was pointing out, they have to plead this at a minimum to meet Rule 8 standards, if not Rule 9. Because a fraud case is Rule 9. Yes, this is a fraud case. That's absolutely right. And I would submit that they don't even satisfy the ICBAL standard. They're generic, generalized complaints. We know that's not enough. They also claim that Yamaha, the Japanese manufacturer, came out with a new model. Rule 9 says you don't have to plead the specifics of knowledge once you satisfy Rule 9b as to the particulars. But, yes, Your Honor, but under Rule 8, at a minimum, as the Supreme Court held in ICBAL, plaintiffs must include sufficient factual enhancement. To show plausibility. Yes, to show plausibility, and that the court can draw upon its experience and common sense. All the repair kits, all the supply kits, all the attention to servicing gave rise to an inference of knowledge. So I'm not sure we can get them on particular, on the ICBAL standard, but I'm looking for an explicit allegation of presale knowledge. When it took place, how it took place, how they knew, even on information and belief, I'm not finding it. Perhaps plaintiffs' lawyer will tell us. Your Honor, I agree with you. They haven't alleged that. And plaintiff mentioned something about an investigator and charter fishing boats. There were some things that he said. Those are not in the complaint. And we have to go with what's in the complaint. So with all due respect, that's not here before us. And consistent with Rule 11, plaintiffs had five opportunities to plead their case. They never mentioned any of that. So here, there's no, the mere development of a new model is not enough, because, first of all, that's the Japanese manufacturer, which is not in the case, and also simply coming out with a new and improved product is not enough to show that you knew about a safety hazard, which, again, Your Honor, I'll bring the court back to that, because plaintiffs have always acknowledged that they had to show that. And here, there's no evidence that any of those complaints or even the replacement kit or anything is evidence of knowledge of a safety problem. So, you know, these motors have been on the market for 17 years without any safety incident, and all of these allegations are speculative. What they're challenging is the timing, the timing of corrosion. They're saying that we didn't expect the corrosion to happen so quickly, even though it was, in some cases, 10 years later. Like every product in my house, it goes wrong just after the warranty period. Your Honor, and the Second Circuit in Abraham v. Volkswagen made that point as well, and that we have limited warranties for a reason, and the consumer has no expectation beyond that which is in the warranty. It's called fraud because you can't get limited explicit warranties. Exactly, and this is not the stuff of fraud. Counsel, what do you make of the allegations in the complaint? It's on Excerpt of Record 136, paragraphs 193 to 195. I imagine he's going to stand up and say, no, here's where we allege knowledge. It talks about the dealership's complaint in Yamaha that the corroded parts were rotted out beyond repair and needed to be replaced entirely. Your Honor, there are, if you'll excuse me, which paragraph was that? Sure, that's paragraphs 193 to 195, Excerpt of Record page 136. Yes, and Your Honor, the complaints, they don't have a specific complaint. These are all very general allegations about complaints, and they're not about safety issues. And so, again, the fact that they don't say in paragraph 194, they don't say when those dealers were complaining, so we don't know. It says beginning in paragraph 193, it says beginning in, well, I see what you're saying. That's the customer service calls. You're saying paragraph 194 does not have a time frame. Yes, it's very generic, and they are trying to, again, where there's smoke, their complaint is a lot of smoke. I'm not sure that's where you want to go. And so I would just bring the Court back to the fact that what they're complaining about is the timing here. So the fact that the corrosion was, they admit, an inevitable consequence of motors being in the water, what they are complaining about is the fact that it happened too soon. That can't transform it into a safety issue. So, and that's really what this case is all about. And the fact that these motors lasted. Why can't it be? It can't, Your Honor, because. At any time the motor fails, it's a safety issue. Your Honor, then again, the Court would be adopting. How long should they last? The Court would be adopting a rule that motors, that all warranties of motors are effectively unconscionable if they don't last for more than, I don't know, a decade or whatever we think would be better than three to five years in this case. And that can't be the law, and it isn't the law. And this Court has made that clear in Clemens, in Wilson v. HP, and the Second Circuit's decision in Abraham. This is a. You want a clear statement that the manufacturer or the distributor knew that the motors or the engine should last a certain period of time, that they should withstand corrosion for a certain period of time, and here they had evidence that it wouldn't do that. And so they kept silent, and they violated their obligation to make fair disclosure. I'm looking for something like that, but I'm not finding it. No, Your Honor, and there's no allegation of any affirmative statement that was misleading or fraudulent. Without it, you can't really answer intelligently. That's exactly right. Thank you, and I believe I'm over my time. You are indeed. Thank you. We took you there, so there you go. Thank you. Okay. All right, counsel, I have a little time for rebuttal. Thank you, Your Honor. To answer the pending question of me, the Yamai Institute of the Buying the Customer Strategy, it was referenced in paragraph 10, paragraphs 197 and 198. They told them they instituted a program to deny warranty claims. It's in 197. They first were told about this issue due to market survey's feedback, which is a consequence of rolling the product out on the market in the first place. We alleged that they knew about, they, Yamaha USA, knew about this problem because they told Yamaha Japan about it. Yamaha Japan had conducted testing on this product. Counsel, let's just say that's all true. Your opposing counsel makes the point that even if that's true, where's the safety concern here? You know, I asked some questions about that a few minutes ago, but the reality is you have no record of anybody being harmed, either by losing control or a fire or anything like that. It's true that there's no warranty forever. How does this convert into a safety issue? Well, first, it would be a rather harsh rule of law to say that a product is not unsafe unless it's killed someone. You don't need to wait until somebody's injured, maimed, or killed by a product before you decide that it's unsafe. In fact, the safety issue is all about making sure that doesn't happen. And for the proposition to be expressed that the plaintiffs have not come forward with any indication that these engines posed a safety risk, I would point to the fact that one plaintiff's engine smoked out and began to emit blue smoke while it was in operation. Another plaintiff's engine overheated on multiple occasions and had to be shut down. While he was out in the water, it had to be shut down in order to let the engine cool down to operate again. Another one continuously overheated. Two different plaintiffs were stranded at sea. I think we know about those. All right. I think we have your point. We thank you for the rebuttal. Thanks to all counsel for their argument. The case just argued is submitted.
judges: M. Smith, Owens, Hellerstein